HAROLD M. TURIELLO *vs.* CITY OF REVERE.

Suffolk.  May 13, 1982. — January 20, 1983.

Present: ARMSTRONG, ROSE, & GREANEY, JJ.

*Practice, Civil,* Master:  recommittal, report of evidence, summary of evidence, findings.  *Contract,* Validity, With municipality.  *Municipal Corporations,* Contract, Municipal finance.

In an action by an architect against the city of Revere, in which the only dispute appeared to be a factual one concerning the cause of leaks in the roof of a high school constructed under the plaintiff's supervision, failure by a master in response to an order of recommittal to summarize certain evidence favorable to the city did not require the judge to recommit the report for further findings or to grant the city's motion to amend the order of reference to require the master to report a full record of the proceedings before him.  [188-189]

In an action by an architect against the city of Revere, certain statements made by a deceased municipal employee respecting the substitution of one method of securing a roof for another, which would have been hearsay if offered to prove the truth of his view that one of the methods was preferable, were admissible for the nonhearsay purposes of showing that the substitution in question was made at the request of the city and that it was the product of a considered decision rather than neglectful supervision by the plaintiff.  [189-190]

In an action by an architect against the city of Revere, it was error for the judge to adopt the master's award of interest from a certain date where the contract between the architect and the city called for final payment to the architect on completion of construction and the master's report furnished no basis for determining the time of completion.  [190-191]

Lack of an appropriation to fund a contract between the city of Revere and an architect at the time when the contract was made did not preclude payment to the architect from a subsequent appropriation.  [191-192]

BILL IN EQUITY filed in the Superior Court on November 2, 1972.

The case was heard by *Mason,* J., on a master's report.

*Ira H. Zaleznik* for the defendant.

*Mario Misci (Jacob I. Brier* with him) for the plaintiff.

ARMSTRONG, J.   The plaintiff performed architectural services for the city of Revere in connection with the construction of a high school during the years 1972-1974.  For his work the plaintiff has been paid $523,616.98, and in this action he claims to be owed certain additional sums.  The case was tried to a master under a nonjury action reference in accordance with the procedure in effect prior to the recent revision of Mass.R.Civ.P. 53.  See 386 Mass. 1236 (1982).  The city appeals from a judgment entered on the master's findings, awarding the plaintiff $75,414.17 with interest from September 5, 1974, and $25,382.40, with interest from September 12, 1972.

After the master filed his report, the plaintiff moved for its adoption.  The city filed seventeen objections to the report, requested summaries of the evidence, and moved for recommittal of the report to the master.  The judge entered an order of recommittal requiring the master to prepare summaries of the evidence relative to the findings which were the subject of five of the objections.  The city made no objection to the limited scope of that order.  Rather, it filed a motion to amend the order of reference so as to require the master to report a full record of the proceedings had before him, including the transcripts of the testimony.  That motion was denied, a ruling that lay within the judge's discretion.  See *Michelson* v. *Aronson,* 4 Mass. App. Ct. 182, 184-187 (1976); *Miller* v. *Winshall,* 9 Mass. App. Ct. 312, 313-314 (1980).

The city, in its original objections to the report, requested that the master summarize the testimony relative to certain findings that were objected to, and designated by transcript reference the testimony to be summarized.  The city later prepared summaries of the testimony which had been designated as bearing on the five objections which were the subject of the recommittal order.  The testimony thus designated tended to contradict the findings in question.  In preparing his own summaries the master declined to include therein

the evidence which had been requested by the city. In this there was no error. The master was not required to summarize all the evidence bearing on the findings in question, *Morin* v. *Clark*, 296 Mass. 479, 483 (1937), but only "'so much of the evidence as shall be necessary' to show that there was evidence 'sufficient in law to support a finding,' care being taken to see that the summary of so much as is summarized is 'accurate and fair' and that it does not by reason of omissions present a distorted picture." *Id.*, quoting from Rule 90 of the Superior Court (1932) (the quoted material also appears in Rule 49[7] of the Superior Court which was in effect until January 1, 1983). The purpose of a summary under the practice in effect prior to the recent revision of rule 53 was not to permit the court to weigh the evidence for and against the master's finding. Rather, rule 49(7) declared that a summary was "for the sole purpose of enabling the court to determine such question of law" and "plainly forb[ade] any attempt to use it for any other purpose." *Minot* v. *Minot*, 319 Mass. 253, 261 (1946). Bearing that in mind, we turn to the summaries made by the master in response to the order of recommittal and the action taken by the judge in overruling the objections and confirming the report.

Four of the objections related to the plaintiff's performance of his obligations under a written contract entered into in 1969, the standard agreement between owner and architect prepared by the American Institute of Architects (AIA Document B131). The contract designated five phases of basic services to be performed by the architect, one of which was supervision of construction. The master found that the plaintiff "satisfactorily completed in an architecturally professional manner all the five phases of [b]asic [s]ervices under the [c]ontract by the date of occupancy namely, September 5, 1974." The contention of the city seems to have been that the plaintiff failed in the supervision stage by permitting a change in the method of securing the roof underlayment, known as "Carey Board", to the metal decking. The result, the city contended, was that the board failed to

adhere properly, creating hills and valleys in the roof and, in turn, ponding during storms, necessitating later replacement of some areas of the roof.

The finding quoted was obviously general in nature, despite being labeled subsidiary. In response to the requirement that he summarize the evidence on which the finding was based, the master reported that supervision was the only issue contested with respect to the basic contract and that his general finding of satisfactory supervision was based on eleven designated subsidiary findings. That response was not improper and did not require further recommittal. See *Morin* v. *Clark*, 296 Mass. at 481-482; *Miller* v. *Winshall*, 9 Mass. App. Ct. at 316. It put the judge in the position of being able to evaluate whether the general finding had adequate support in the stated subsidiary findings. *Bills* v. *Nunno*, 4 Mass. App. Ct. 279, 281-283 (1976). Those findings were to the effect that the change in the method of adhering the Carey board to the metal decking by substituting "over-sized massive staples put down with a machine gun for the self-tapping screws" was not the result of inadequate supervision by the plaintiff but was a conscious design change insisted on by a clerk of the works appointed by the mayor of the city, a man with twenty-five years of experience as Supervisor of Plans in the Commonwealth's Department of Public Works,[1] for the purpose of reducing the likelihood of eventual leakage through the larger screw holes. The change was agreed to by the plaintiff and by the roofing and flashing sub-contractor, who was "a General Electric Qualified Applicator of GE Roofing Systems." (The roof was a so called "urethane roof," consisting of "Carey Asbestos-Seal Base Material [the Carey board], urethene spray foam, and General Electric Roof Coating, consisting of a silicone weatherproof rubber membrane.") The sub-contractor issued a "General Electric Company Roofing

---

[1] The master's summary of the evidence indicates that the clerk of the works had been the Supervisor of Plans in the Department of Public Safety, rather than the Department of Public Works.

Systems Warranty," which was "also executed on behalf of General Electric Company on May 3, 1974." The master concluded that the staples were an appropriate substitute for the self-tapping screws and held the Carey board underlayment to the metal decking equally securely. Rejecting the city's contention that the substitution was the cause of the problems later encountered, he found that the real cause was "negligent maintenance of the roof by the [city], by excessive passage on the roof, by the use of mechanical snow clearing devices, and manual clearance of snow, vandalism, and also by hurricane winds . . . ."

One of the objections was directed at the finding which indicated the position taken by the city's clerk of the works with respect to the substitution of staples. The clerk of the works had died before the master's hearing, and the city's contention, relying on *Old Colony Trust Co.* v. *Shaw,* 348 Mass. 212 (1964), appears to be that his declarations were inadmissible as hearsay. While it is true that his declarations would be hearsay if offered to prove the truth of his view that stapling was a preferable method of adhesion, they were also relevant for the nonhearsay purposes of showing the origin of the substitution and the fact that it was the product of a considered decision rather than neglectful supervision by the plaintiff. The objection to the admission of the conversation, so far as the record discloses, was general, and was thus properly overruled. *Uloth* v. *City Tank Corp.,* 376 Mass. 874, 884 (1978). Liacos, Massachusetts Evidence 73 (5th ed. 1981).

The city objected to a finding that "General Electric was satisfied with the work performed by the [r]oofing and [f]lashing subcontractor." The master's summary of the evidence disclosed that the finding was based on evidence that one Patterson, who was "employed by Silicone Products Department of General Electric Company" and "had the technical responsibility for the urethane foam silicone roofing program," inspected the roof during construction for the purpose of advising General Electric on the issuance of the warranty. Patterson observed the method of fastening

the Carey board and did not advise General Electric not to issue the warranty. The warranty was issued after the Carey board was applied and after Patterson's inspection. The master's summary was proper for the reasons given at the outset of this opinion; he was not obliged to include in his summary the evidence upon which the city relies in its assertion that General Electric inspectors concluded, apparently at a somewhat later point in time, that the roof was in an unacceptable condition.

The master made a finding that, in addition to the General Electric warranty, "the contract provided for a five year guarantee of the roof given by the [r]oofing and [f]lashing subcontractor." Here the city's objection was that there was to be only one warranty, not two; the difference seems to be one of contract interpretation which would have been suitable for resolution by the court but for the fact that the issue was only tangentially related to those on which the case turns.

The general picture developed by the summaries (both the city's and the master's) on this branch of the case is that the decision to substitute staples for screws was made in order to improve leakage resistance; that the change was originally regarded as acceptable by all parties; that at a subsequent time (how much later was disputed) problems developed requiring extensive repairs to the roof; that there was a factual dispute whether the problems resulted from the use of the staples or from other causes, such as excessive traffic, use of machines for snow-removal, vandalism, and the like; and that the master chose to believe the latter causes. Such a dispute must be resolved, of course, by the finder of fact. The judge could, and apparently did, conclude that no purpose would be served by further amplification of the basis for the master's findings. The ruling did not exceed the bounds of proper discretion.

A related point has to do with the computation of interest on the portion of the award arising from the basic services contract ($75,414.17). The judge, adopting the master's conclusion, awarded interest from September 5, 1974. That

was the date the school was opened to students. The master found that construction was completed by that time. That finding was challenged and was one of those for which the master was directed to summarize the basis. Such evidence as was disclosed in the summary indicated that construction was not completed until some time after February, 1975. The contract called for final payment to the architect on completion of construction. The architect is not entitled to interest prior to the time payment was due. *Perkins Sch. for the Blind* v. *Rate Setting Commn.*, 383 Mass. 825, 831-832 (1981). Because the master's report furnishes no basis for determining the time of completion, the case must be remanded for further findings in this area.

In addition to the basic services contract, the plaintiff was awarded $25,382.40 for additional services relating to interior design and furnishings. This recovery was based on a separate contract entered into between the plaintiff and the mayor (in behalf of the city) in the spring of 1971. When the work called for by the contract was eighty percent complete, the mayor, for reasons not disclosed by the record, ordered the plaintiff to cease work. The award represents eighty percent of the contract amount, less amounts paid during the course of the work.

The city's argument is that the contract was a nullity when entered into because the city council had not yet appropriated money for the furnishings work. The city further contends that under G. L. c. 44, § 31, and *Jenny* v. *Mattapoisett,* 335 Mass. 673 (1957), the plaintiff cannot be paid from a subsequent appropriation, made in December, 1981, because of the invalidity of the contract when entered into.

The *Jenny* case, as we read it, turned on a somewhat different principle: namely, the lack of authority in the finance committee to have engaged in plaintiff's services with or without an appropriation. The opinion indicates, at 674, that if the finance committee had had such authority, the plaintiff might have been paid for services rendered after the appropriation, despite his having been engaged

prior thereto.[2] The opinion in *Rich & Son Constr. v. Saugus,* 355 Mass. 304 (1969), does not indicate that the town ever appropriated money to fund the contract sued on. Nothing in *Arthur R. Murphy, AIA, & Associates* v. *Brockton,* 364 Mass. 377 (1973), or *Marlborough* v. *Cybulski, Ohnemus & Associates,* 370 Mass. 157 (1976), both cases in which the architect sought recovery of an amount in excess of the amount appropriated for architectural services, suggests that the plaintiff may not be paid for his services where, as is tacitly conceded to be the case here, there is such an appropriation. No other error is argued with respect to the award on the additional contract.

For the reasons stated above, the portion of the judgment ordering the payment of interest on the basic services contract is reversed, and the case is remanded for further proceedings thereon in conformity with this opinion. The remainder of the judgment is affirmed.

*So ordered.*

---

[2] Compare *Adalian Bros.* v. *Boston,* 323 Mass. 629 (1949), in which, despite the subsequent appropriation, the contract was held unenforceable due to the city's failure to comply with the bidding laws.